IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SCOTT HAMPTON,                          CASE NO. 2:07-CV-747
                                        JUDGE HOLSCHUH
              Petitioner,               MAGISTRATE JUDGE KING

      v.


ERNIE MOORE, Warden,

      Respondent.

REPORT AND RECOMMENDATION

      Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant

to 28 U.S.C. 2254.  This matter is before the Court on the petition, respondent's return of

writ, petitioner's traverse and the exhibits of the parties.  For the reasons that follow, the

Magistrate Judge RECOMMENDS that this action be DISMISSED.

FACTS and PROCEDURAL HISTORY

      The Ohio Tenth District Court of Appeals summarized the facts and procedural

history of this case as follows:

> On February 27, 2003, the Franklin County Grand Jury indicted
> defendant Hampton, as well as Timothy Gaines and Jeremy
> Williamson, on one count of engaging in a pattern of corrupt
> activity, one count of participating in a criminal gang, and
> multiple counts of robbery and kidnapping. Specifically, the
> charges against defendant were as follows: count one,
> engaging in a pattern of corrupt activity; count two,
> participating in a criminal gang; count three, aggravated
> robbery of Monica Omari, with firearm and gang
> specifications; count four, aggravated robbery of Kenric Duffy,
> with firearm and gang specifications; count five, kidnapping of
> Monica Omari, with firearm and gang specifications; count six,

kidnapping of Kenric Duffy, with firearm and gang specifications; count nine, aggravated robbery of Brian Valley, with firearm and gang specifications; count ten, kidnapping of Brian Valley, with firearm and gang specifications.

On July 18, 2003, a jury trial commenced. The first trial resulted in a mistrial as a result of the emergence of previously unknown evidence. On July 21, 2003, the trial court filed a journal entry, which stated in part:

On Monday, July 21, 2003, counsel for the state advised that additional evidence, unknown to the prosecution, was disclosed by the investigating detective on Friday, July 18th and Monday, July 21, 2003. The court explored various options with counsel for both parties. The defense moved for a mistrial, which was granted and the jury was discharged.

On May 11, 2004, a second jury trial commenced. At the beginning of defendant's second trial, counts two (participating in a criminal gang), five (kidnapping of Monica Omari, with specifications), and six (kidnapping of Kenric Duffy, with specifications), were dismissed. Defense counsel moved for a dismissal of the remaining charges in the indictment on the basis of the constitutional prohibition against double jeopardy. The trial court denied defendant's motion, and the case proceeded on the remaining charges. At the second trial, four individuals testified: Brian Valley, Monica Omari, Jessica Davis, and Kenric Duffy.

Brian Valley testified as follows. On the evening of October 24, 2002, Mr. Valley, an Ohio State University student, went to a concert in Cincinnati with his brother and a friend. The three drove back to Columbus, he dropped off his brother and the friend at a restaurant, and then proceeded to his apartment at East 12th Avenue, in Franklin County. He arrived at the apartment at approximately 1:00 or 1:30 a.m., Friday, October 25, 2002, and parked his car outside in a parking lot behind the apartment complex. As he exited his car, he saw two men approaching him. One man asked him if he could "score him some dope." (May 11, 2004, *Tr.* 41.) He answered in the negative, and then the man came closer to him, pulled out a

2

small black automatic gun, placed it at his stomach, and told him to get out his keys. Mr. Valley described this man as approximately 5 feet 9 or 5 feet 10 inches tall and stocky. The man was wearing a baseball cap.

Mr. Valley gave the man the car keys, and the man pointed to the other individual, who was about 15 to 20 feet away from them. That man also pulled out a gun, "to show [Mr. Valley] he had one on him." (*Id.* at 43.) Mr. Valley described that man as taller and thinner than the other, and that he was wearing a blue bandanna on his head. Mr. Valley got into the car and sat on the front passenger seat. The man, who first approached him, got into the driver's seat, and the second man sat in the backseat, behind Mr. Valley. The second man put a gun to Mr. Valley's head. Mr. Valley was told that if he did not fully cooperate with them, they would kill him. They told him not to look at their faces and to put his head between his legs. The two men told Mr. Valley that their actions were gang-related. The driver stated that he wanted to go to an ATM machine in a quiet area. The driver drove downtown and then to State Route 161. They arrived at an ATM, and Mr. Valley was told to withdraw money. He withdrew $300, gave them the cash, got back into the car, and put his head between his legs.

Mr. Valley testified that the driver pulled into a parking lot, another car pulled up, and the drivers discussed where they were going to meet. He could not see the other car or the driver of the other car. They drove to another location and ordered Mr. Valley to get out of the car and to not look back at them or they would kill him, and to wait about five minutes before leaving. They told him where his car could be found, with the keys in it. He exited the car, did not look back, waited about five minutes, and walked to his car, which he found at the location they had specified. In addition to the $300, the men had taken his watch and wallet. He then drove home and called the police. A Columbus police officer arrived at Mr. Valley's home and took a report. A few days later a detective spoke with Mr. Valley and showed him a photo array. He was able to identify one of the men, the driver of his car, who was Timothy Gaines.

3

Monica Ornari testified as follows. In October of 2002, Ms. Omari worked at the Platinum Fox on Hamilton Road in Franklin County. On October 25, 2002, she left work at about 3:30 a.m., with approximately $1,500 in cash she had earned. Ms. Omari's boyfriend, Kenric Duffy, had been waiting for her outside to take her home. They drove to her home at an apartment complex, which was about one-half mile away. When they parked in the parking lot, Ms. Omari noticed a four-door, "silverish-color" car drive by in front of them. (*Id.* at 82.) Ms. Omari believed there were four persons in the car, which to her "looked like a Chevy, like a Cavalier." (*Id.* at 83.) She saw two men exit the car and approach them. She asked Mr. Duffy whether he knew them, and he told her he did not know them.

The two men, with guns displayed, approached Ms. Omari and Mr. Duffy from both sides of their car, and ordered them to come out of the car. She described one of the men as "short and stocky," and the other as "real tall." (*Id.* at 84.) She testified that the shorter man was wearing a red bandanna over his face, and the other man was wearing a blue bandanna over his face. The man that approached on Ms. Omari's side of the car had an automatic gun. He ordered her to give him her possessions. She gave him her workbag and her purse, which contained the $1,500 in cash. She saw the other man pointing a gun at Mr. Duffy and Mr. Duffy giving the man his possessions. She then saw the two men run toward the car, which was moving, and get into it. She testified that she noticed that the license plate of the car said, "TIM'S BABY." (*Id.* at 92.) After the assailants left in the car, Ms. Omari and Mr. Duffy ran into their apartment and Ms. Omari dialed 911.

On October 27, 2002, Ms. Omari met with a detective, who showed her photo arrays. She was able to identify the man that held the gun to her. She was unable to identify the driver of the getaway vehicle, but described the person as a white male.

Mr. Duffy's testimony at the second trial was as follows. In October 2002, Ms. Omari was living with Mr. Duffy in his apartment. Around 2:30 or 3:00 a.m., on October 25, 2002, Mr. Duffy picked up Ms. Omari at the Platinum Fox, where she

4

worked. They drove back to his apartment. Mr. Duffy noticed another car following them to the apartment complex. As he was backing his car into a parking space, he saw the other car in front of them. According to Mr. Duffy's testimony, there were three persons that were visible in the other car. He described the car as a "light silver or bluish Chevy Lumina." (May 13, 2004, *Tr.* 126.) Mr. Duffy testified that two men approached him and Ms. Omari, and while they were approaching them, the car they had been inside continued to move. (*Id.* at 127.) The two men tapped on the windows of the car with guns, demanded that they get out of the car, and demanded money. Mr. Duffy gave them cash, a watch, and a necklace. Upon looking at photo arrays shortly after the robbery, Mr. Duffy was able to identify Gaines and Williamson as the two men who approached his car.

Regarding the identity of the driver, Mr. Duffy testified as follows at the second trial:

[Prosecutor]: Handing you state's exhibit 7, and it also has six photographs, correct?

[Mr. Duffy]: That's correct.

Q. Now, that document, you didn't sign your name on any picture; is that correct?

A. That's right.

Q. You signed it above all of the pictures?

A. Right.

Q. Why did you do that?

A. I wasn't sure exactly, but the number 1 and number 4 guy stood out.

Q. Number 1 and number 4?

A. Right.

Q. Okay. Now, where did you recognize number 1 or number 4 as?

A. As the driver.

Q. From?

A. As the driver of the vehicle.

Q. Which vehicle would that be?

A. The Lumina, silver one.

Q. Did you see anyone in the courtroom that resembles either the individual in photograph number 1 or photograph number 4?

A. Yes, I do.

Q. And where do you see this person that resembles?

A. The gentleman sitting right there.

Q. Can you describe what he's wearing?

A. Light blue shirt with a grayish, blue tie.

[Prosecutor]: Your Honor, would the record reflect that the witness has identified the defendant?

The Court: Insofar as he says that it looks like-which one? Number 1 or 4 or both?

[Mr. Duffy]: Number 1 and four.

The Court: Looks, insofar as it appears to be similar to, looks like those pictures, yes.

Q. And does the individual that you just pointed out, resemble one of those pictures more than another?

6

A. Yes, they do.

Q. Which one?

A. Number 4.

Q. And do you recognize, from where did you say you recognized the photographs numbered 1 and 4 from?

A. As the driver.  (May 13, 2004, *Tr.* 140-142.)

Jessica Davis testified at the second trial, and her testimony was as follows. Ms. Davis first met defendant around November or December 2000 when she moved into an apartment after turning 18 years old. Defendant helped her move into the apartment. A romantic relationship between the two developed and defendant moved in with her. Ms. Davis testified that she did not get along well with defendant, and the two would verbally and physically fight. They would periodically break up and then reconcile. Defendant moved out of the apartment in April 2001, but moved back for a brief period in September 2002. About two weeks prior to defendant moving back with her in September 2002, defendant asked Ms. Davis if a friend of his, Williamson, could live with her. Ms. Davis decided to let Williamson move in with her.

When defendant moved back in with Ms. Davis, she heard a conversation between defendant and Williamson relating to gang activity. Specifically, Ms. Davis testified as follows:

A. Basically, they were talking about being in a gang and going out and doing illegal activities to get money. That's basically what the conversation was about. I wasn't trying to listen too hard.

Q. Why's that?

A. Because a lot of the conversations like that that come out of their mouths are just bogus, so I usually didn't pay too much attention.  (May 12, 2004, *Tr.* 179.)

7

Ms. Davis testified that defendant referred to Williamson as his "O.G." or "Original Gangster," that the gang's name was the "Rolling Sixties Crips," and that no persons other than Williamson, Gaines, and defendant were ever mentioned as members of the gang. (*Id.* at 180.) However, she indicated that defendant wanted to get neighborhood kids involved in the gang by physically beating them, as an initiation. She also testified that "they showed gang symbols. They told me they wore gang colors." (May 13, 2004, *Tr.* 38.) During the two-week period after defendant moved back in with her in September 2002, Ms. Davis heard regular conversations regarding gangs. During these conversations defendant and Williamson discussed selling drugs and robbing people for money.

Ms. Davis voiced her concerns to defendant about his being involved in a gang. Two or three weeks after defendant had moved back in with Ms. Davis, she asked him to leave. He left, but within a week she let him stay with her for a couple of days because he had been in a fight with his new roommate. He left again, and she did not hear from him until Thursday, October 24, 2002.

On October 24, 2002, Ms. Davis was at the home of Brandy Sergeant, who was her friend and neighbor. According to Ms. Davis, Williamson and Ms. Sergeant were together as boyfriend and girlfriend. While she was at Ms. Sergeant's home, Ms. Sergeant went outside to see Williamson, who was with Gaines and defendant. Defendant called Ms. Sergeant's home and Ms. Davis answered. Defendant informed Ms. Davis that he, Williamson, and Gaines, were going to go do some things.

At approximately 2 a.m. on October 25, 2002, defendant again called Ms. Sergeant's home. Ms. Sergeant answered the telephone and handed it to Ms. Davis. Ms. Davis testified as to what was said in that telephone call:

I asked him where he was. He said he was driving. I asked him whose car he was driving. He said, "Tim's car." I said, "Where's Tim and Jeremy?" He said, "They are in the car in

front of us." And I asked him what he was doing. And, you know, he said "We got some stuff to do, we're about to get some money, some G." That is what he told me. And then there was a muffle. He said, "Hold on." He put the phone down or he covered it, one or the other, and then he got back on the phone and said he was holding a gun. (May 12, 2004, *Tr.* 190.)

According to Ms. Davis, defendant said that Gaines and Williamson were driving "some dude's" car, and that they were near State Route 161 and Karl Road, going to a bank. (*Id.* at 191.) Ms. Davis testified that defendant said that they were going to "pull a lick," which, according to Ms. Davis, means "robbing somebody, stealing something." (May 13, 2004, *Tr.* 64.) When the conversation ended, Ms. Davis hung up the telephone.

Ms. Davis then went outside to a pay phone to call defendant back on the cell phone he was using. She wanted to know what was happening with defendant. When she contacted defendant, she asked what they were doing, but she did not get much of a response because Gaines got into the car with defendant and was asking defendant why he was on the phone and to whom he was talking. Defendant indicated that he had to go and hung up the telephone and did not call back.

Approximately one hour and 15 minutes later, Ms. Sergeant knocked on Ms. Davis's door and stated that she needed Ms. Davis to go with her to pick up Williamson. Ms. Davis went with Ms. Sergeant to Gahanna to pick up Williamson. When they arrived in Gahanna, they saw a police blockade about two miles away. They turned into a side road, where Williamson was hiding under a car. According to Ms. Davis, Williamson "popped out from underneath a car and hopped in the back seat, laid down." (May 12, 2004, *Tr.* 195 .) They drove back to the apartment building where Ms. Davis and Ms. Sergeant lived. On the way back to the apartment building, Williamson told Ms. Davis about a robbery. He told her that he had robbed someone at the person's car. He told her that he had gotten into the backseat of the car, Gaines got into the driver's seat, and defendant followed them in Gaines's girlfriend's car. He

9

further told her that they had taken the person in the car at gunpoint to a bank to withdraw money from an ATM. According to Ms. Davis, the car of Gaines's girlfriend was a "lavender, purple" Chevrolet Lumina, with a "TIM'S BABY" license plate. (*Id*. at 205.) Williamson told Ms. Davis that there was another incident that night, which occurred after they dropped off defendant. Regarding this incident, Ms. Davis testified that "[Williamson] told [her] nothing happened. They didn't get anything. He was really very nervous and very-not himself when he was talking about that one." (May 12, 2004, *Tr.* 206 .)

Williamson had informed Ms. Davis that guns had been used in the robbery, and that he did not want to recover the gun himself. At some point in time that night, Ms. Davis and Ms. Sergeant went back to Gahanna, because of Ms. Davis's conversation with Williamson. They drove to a bridge, which was about one-half mile from Gaines and Williamson's home. Receiving directions by phone from Williamson, Ms. Davis recovered two guns.

The jury found defendant guilty of count one, engaging in a pattern of corrupt activity, a felony of the first degree; guilty of count three, aggravated robbery, a felony of the first degree; guilty of count four, aggravated robbery, a felony of the first degree; guilty of count nine, aggravated robbery, a felony of the first degree; and guilty of count ten, kidnapping, a felony of the second degree. As to counts three, four, nine, and ten, the jury found defendant guilty of the firearm and gang specifications.

On July 12, 2004, the trial court entered judgment, sentencing defendant to prison. Specifically, the trial court sentenced defendant to three years in prison as to count one, seven years as to count three, four years as to count four, seven years as to count nine, and three years as to count ten. The trial court ruled that counts three and four are to be served concurrently with each other but consecutively to counts nine and ten, counts nine and ten are to be served concurrently with each other but consecutively to counts three and four, and count one is to be served concurrently with all of the other counts.

Therefore, the total sentence imposed was 14 years in prison. Defendant received 488 days of credit for time served.

*State v. Hampton*, 2005 WL 3557455 (Ohio App. 10th Dist. December 30, 2005); *Exhibit 8 to Return of Writ.* Represented by the public defender as new counsel, petitioner filed a timely appeal. He raised the following assignments of error:

FIRST ASSIGNMENT OF ERROR

The trial court erred in denying the defense motion to dismiss following the declaration of a mistrial, thereby violating the Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

SECOND ASSIGNMENT OF ERROR

The trial court erred in admitting hearsay statements from coconspirators that were not made in furtherance of the conspiracy and lacked independent proof of the conspiracy, as required by Evid.R. 801(D)(2)(e).

THIRD ASSIGNMENT OF ERROR

There was insufficient competent evidence to establish a corpus delicti as to the existence of a criminal enterprise or gang activity prior to introducing Appellant's statements.

FOURTH ASSIGNMENT OF ERROR

There was insufficient evidence to support the guilty verdicts as to the second robbery involving Omari and Duffy and the offense of engaging in a pattern of corrupt activity, thereby depriving Appellant of his due process protections under the state and federal Constitutions.

FIFTH ASSIGNMENT OF ERROR

The trial court erred in imposing consecutive sentences based on facts not found by the jury or admitted by appellant. This

omission violated Appellant's rights to a trial by jury and due process under the state and federal Constitutions.

*See id.* On December 30, 2005, the appellate court affirmed the judgment of the trial court.

Still represented by the public defender, petitioner filed a timely appeal to the Ohio Supreme Court.  He raised the following propositions of law:

> 1.   Where the court declares a mistrial as the result of prosecutorial misconduct and which has the effect of strengthening the state's case, a retrial would be barred under the Fifth and Fourteenth Amendments to the United States Constitution and Section 10 Article I of the Ohio Constitution.
>
> 2.  In order to be admissible as proof of gang activities, out-of-court statements from co-conspirators must be made in furtherance of the conspiracy and must first be supported by independent proof of the conspiracy.
>
> 3.   The trial court erred in imposing consecutive sentences based on facts not found by the jury or admitted by appellant. This omission violated appellant's rights to a trial by jury and due process under the State and federal Constitutions.

*Exhibit 9 to Return of Writ.*  On May 3, 2006, the Ohio Supreme Court accepted the appeal as to petitioner's third proposition of law and remanded the case for re-sentencing under *State v. Foster*, 109 Ohio St.3d 1 (2006).  On December 14, 2006, pursuant to the remand from the Ohio Supreme Court, the trial court re-sentenced petitioner.  *Exhibits 18 and 19 to Return of Writ.*  Petitioner did not appeal.

On March 24, 2006, petitioner filed a *pro se* application to reopen the appeal pursuant to Ohio Appellate Rule 26(B).  He asserted that he had been denied the effective assistance of counsel because his attorney failed to raise the following claims on direct appeal:

1.   Appellant was deprived of the effective assistance of counsel at trial in violation of the state and federal constitutions where counsel purported to effect a waiver of a substantive constitutional right contrary to appellant's express demand.

2.  Appellant's right to due process of law was violated where the prosecutor presented testimony known to be false and failed to correct it.

3.  Appellant's right to due process of law and to a fair trial by an impartial jury was violated by the failure to give appropriate accomplice testimony instructions to the jury.

*Exhibit 12 to Return of Writ*.  On June 27, 2006, the appellate court denied petitioner's Rule 26(B) application.  *Exhibit 14 to Return of Writ*.  Petitioner filed a timely appeal in which he again raised the same propositions of law; however, on October 4, 2006, the Ohio Supreme Court dismissed that appeal.  *Exhibits 15 and 17 to Return of Writ*.

On August 1, 2007, still represented by the public defender, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. 2254.  He alleges that he is in custody in violation of the United States Constitution based upon the following ground:

Because the misconduct of the State goaded petitioner into moving for a mistrial in his first trial, the trial court's decision, refusing to dismiss the case and allowing the State to re-try him, which allowed the State to strengthen its case through its own misconduct, violated petitioner's rights under the Double Jeopardy Clause of the Fifth Amendment.

It is the position of the respondent that this claim is without merit.

**MERITS**

13

In his sole claim for habeas corpus relief, petitioner asserts that his re-trial after the grant of petitioner's request for a mistrial violated the Double Jeopardy Clause because the prosecutor intentionally provoked the mistrial by failing to timely disclose evidence which it then used to strengthen its case against petitioner in his second trial. The state appellate court rejected this claim as follows:

> Under defendant's first assignment of error, he argues that the trial court erred in denying his motion to dismiss, which followed the declaration of a mistrial. Defendant argues that he "was forced to move for a mistrial after the state sought to disclose highly damaging evidence that had not been provided to the defense in discovery." (Defendant's brief, at 12.) Moreover, defendant argues that "the declaration of a mistrial was instigated by prosecutorial misconduct designed to provoke a mistrial." (*Id.* at 18.) Defendant argues that the trial court's denial of his motion to dismiss violated the prohibition against double jeopardy contained in the state and federal constitutions. The state contends that the trial court did not abuse its discretion in denying defendant's motion to dismiss.

> The Double Jeopardy Clauses of the Ohio and United States Constitutions protect a criminal defendant from repeated prosecutions for the same offense. *State v. Rance* (1999), 85 Ohio St.3d 632, 634. As a general rule, when a trial court grants a defendant's motion for a mistrial, the Double Jeopardy Clause does not bar a retrial. *State v. Loza* (1994), 71 Ohio St.3d 61, 70, citing *Oregon v. Kennedy* (1982), 456 U.S. 667, 671, 102 S.Ct. 2083. "A narrow exception lies where the request for a mistrial is precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial." *Id.* Furthermore, "[o]nly where the prosecutorial conduct in question is intended to 'goad' the defendant into moving for a mistrial may defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own." *Id.* "Mere negligence will not suffice to show intent to provoke a mistrial." *State v. Ivers,* Butler App. No. CA2002-12-305, 2003-Ohio-6254, at ¶ 11, citing *State v. Girts* (1997), 121

14

Ohio App.3d 539, 553.

On Friday, July 18, 2003, the first day of the first trial, the parties made opening statements, and three of the state's witnesses, Brian Valley, Kenric Duffy, and Monica Omari, testified. In defense counsel's opening statements, he stated that he anticipated that Jessica Davis would attempt to implicate defendant in robberies. In an effort to discredit her anticipated testimony, defense counsel indicated that Ms. Davis, as defendant's ex-girlfriend, had "a certain agenda." (July 18, 2003, *Tr.* 10.) He implied that she had waited over four months to go to the police regarding what she knew, which was "after a fall-out of sorts some time in March." (*Id.* at 11.)

At the beginning of the next day of trial, Monday, July 21, 2003, one of the prosecutors informed the court that, on the morning of the previous Friday, a Columbus police detective informed the state of the existence of a taped interview of defendant, which was in the possession of the detective. The prosecutor also discussed previously unknown information regarding Ms. Davis. Namely, the state asserted that it first learned that morning that Ms. Davis had looked at three photo arrays when she went to the police within days of the robberies. The timing of when Ms. Davis went to the police was significant in view of defense counsel's opening statements regarding her.

The state indicated its willingness not to use the interview of defendant or the three photo arrays that Ms. Davis had viewed. The state indicated its lack of knowledge regarding this evidence, and asserted that there had been no willful discovery violation. Defense counsel requested that any information regarding the October 27, 2002, police interview with Ms. Davis, as well as the photo arrays that she had viewed on that day, be suppressed. The state maintained that it would be inappropriate to suppress any information regarding the date Ms. Davis went to the police. Defense counsel argued that, had he known when Ms. Davis went to the police, which would have been revealed to him had he been provided the photo array shown to Ms. Davis, he would not have made the same opening statements regarding her. Defense counsel stated that if the trial court would not

15

suppress the evidence, it was moving for a mistrial. The state opposed the request for a mistrial. The trial court determined that it could not suppress the evidence as requested by defendant, and accordingly declared a mistrial.

In his brief, defendant argues that, at the time the first trial ended, the state had not established key elements in support of its case against defendant. Defendant seems to argue that this provided motivation for the state to attempt to goad defendant into seeking a mistrial. Contrary to this argument, the status of the evidence at the time the prosecutors became aware of the evidence did not establish an intent to provoke a mistrial.

Nothing in the record indicates that the prosecution intentionally attempted to provoke the defense into seeking a mistrial. In fact, the state indicated a willingness not to use the taped interview of defendant and the photo arrays shown to Ms. Davis, in order to prevent a mistrial resulting from the emergence of this previously unknown evidence. Furthermore, we observe that the central reason for the granting of the mistrial was that defendant was prejudiced because his counsel would not have made the particular opening statements regarding the timeline of events, which would have been significantly undermined at trial, had he been provided the photo arrays shown to Ms. Davis. In this regard, the prosecution's assertion before the trial court that it was not aware, until the morning of trial, that Ms. Davis had been shown photo arrays, revealed that the prosecution did not intentionally withhold this evidence from the defense. Moreover, defendant has cited nothing in the record which would indicate that the prosecution intentionally misled his counsel into believing that Ms. Davis waited over four months to initially go to the police.

Under these facts, we cannot conclude that the prosecution was intentionally provoking defendant into seeking a mistrial. Therefore, the Double Jeopardy Clauses of the Ohio and United States Constitutions did not preclude the second trial in this case.

Accordingly, we overrule defendant's first assignment of error.

16

*State v. Hampton, supra.*

The decision of the state appellate court is presumed to be correct. 28 U.S.C. §2254(d), (e) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*Id.*

> A state court's determination is contrary to federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or on indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that principle to the facts before it in an unreasonable manner. *Id.* at 413, 120 S.Ct. 1495.

*Maldonado v. Wilson,* 416 F.3d 470, 475 (6th Cir. 2005). Review of the record fails to reflect

17

that the state appellate court's decision denying petitioner's claim is unreasonable so as to justify federal habeas corpus relief.  *See Williams v. Taylor, supra.*

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause has been interpreted as protecting criminal defendants from successive prosecutions for the same offense after acquittal or conviction, as well as from multiple punishments for the same offense.  *Brown v. Ohio*, 432 U.S. 161, 165 (1977).

> The Double Jeopardy Clause... precludes the State from making " 'repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity.'" *United States v. Dinitz,* 424 U.S. 600, 606, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976) (quoting *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957)). It protects defendants in cases "in which a judge exercises his authority to help the prosecution, at a trial in which its case is going badly, by affording it another, more favorable opportunity to convict the accused." *Gori v. United States,* 367 U.S. 364, 369, 81 S.Ct. 1523, 1526-27, 6 L.Ed.2d 901 (1961). It also protects the defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *accord Arizona v. Washington,* 434 U.S. 497, 503-04, 98 S.Ct. 824, 829-30, 54 L.Ed.2d 717 (1978); *Dinitz,* 424 U.S. at 606, 96 S.Ct. at 1079; *Jorn,* 400 U.S. at 484-85, 91 S.Ct. at 556-57.

*Harpster v. Ohio,* 128 F.3d 322, 327 (6th Cir. 1999).  Where a mistrial is declared at the defendant's request, the Double Jeopardy Clause does not prohibit re-trial on the charges unless circumstances indicate that the prosecutor intentionally provoked, or goaded, the

defendant into requesting a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 676-79 (1982). Merely establishing that the prosecutor acted improperly is not sufficient to meet this standard; the defendant must show that the prosecutor acted with the purpose of aborting trial proceedings:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion ... does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes "a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *United States v. Scott*, 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." *United States v. Dinitz, supra*, 424 U.S., at 609, 96 S.Ct., at 1080. Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Id.*, at 675-76.

> "The requirement of intent is critical, and easily misunderstood. The fact that the government blunders at trial and the blunder precipitates a successful motion for mistrial does not bar a retrial. Yet the blunder will almost always be intentional-the product of a deliberate action, not of a mere slip of the tongue. A prosecutor who in closing argument comments improperly on the defendant's failure to have taken the stand, thus precipitating a mistrial or a reversal on appeal, is no doubt speaking deliberately, though his judgment may be fogged by the heat of combat. But **unless he is trying to abort the trial, his misconduct will not bar a retrial. It doesn't even**

19

> **matter that he knows that he is acting improperly, provided that his aim is to get a conviction. The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means."**

*United States v. Barnwell*, 2008 WL 2447133 (E.D. Michigan June 18, 2008) (citations omitted;

emphasis added) (quoting *United States v. Oseni*, 996 F.2d 186, 188 (7th Cir. 1993).  Further,

> appellate courts, including the Sixth Circuit, have been very reluctant to find the intent necessary to satisfy the *Kennedy* standard. *See, e.g., United States v. Koubriti*, 509 F.3d 746, 749 (6th Cir.2007), *cert. denied,* --- U.S. - - - - , --- S.Ct. ----, ---L.Ed.2d - - - - , 2008 WL 717678 (Apr. 14, 2008); *United States v. Thomas,* 728 F.2d 313, 318 (6th Cir. 1984) (no double jeopardy bar to retrial where the Court's "review of the record leads us to conclude that none of the prosecutor's behavior here will pass the intentional-goading-into-mistrial test of *Oregon*" ); *United States v. Curry,* 328 F.3d 970, 973 (8th Cir. 2003) (district court's ruling that retrial was not barred following post-trial grant of defendant's mid-trial motion for mistrial upheld on the basis that, despite the prosecutor's withholding of material impeachment evidence and improper comments during closing argument, these actions were not an attempt to goad defendant into requesting a mistrial); *United States v. Gonzalez,* 248 F.3d 1201, 1204 (10th Cir. 2001) (government's appeal of the district court's grant of defendant's mistrial motion not barred because the government's intent in introducing allegedly prejudicial evidence may have been to obtain a conviction rather than a mistrial); *United States v. Strickland,* 245 F.3d 368, 384 (4th Cir. 2001), *cert. denied,* 534 U.S. 894, 122 S.Ct. 213, 151 L.Ed.2d 152 (2001) (government's concealment of discoverable materials held not intended to provoke mistrial); *Greyson v. Kellam,* 937 F.2d 1409 (9th Cir. 1991) (no double jeopardy bar to retrial where misconduct showed the prosecutor's desire to *convict,* and not an intent to goad defendant into moving for mistrial).

*Id.*

    Petitioner first contends that the state appellate court's conclusion, *i.e.,* that the

record did not establish an intent on the part of the prosecutor to provoke a mistrial, constitutes a mixed question of fact and law which is not presumed to be correct under 28 U.S.C. §2254(e)(1) and which is not entitled to deference in these habeas corpus proceedings. Petitioner also asserts that the state court's rejection of petitioner's claim constitutes an unreasonable determination of the facts and an overly restrictive and unreasonable construction of *Oregon v. Kennedy, supra. See Traverse.* This Court is not persuaded by petitioner's arguments.

The United States Supreme Court held in *Oregon v. Kennedy, supra*, that a court's determination of whether the prosecutor intended to provoke a mistrial constitutes a "finding of fact":

> [A] standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system.

*Oregon v. Kennedy, supra*, 456 U.S. at 765; *see also United States v. Colvin*, 138 Fed.Appx. 816, unpublished, 2005 WL 1655025 (6th Cir. July 14, 2005), citing *United States v. Vallejo*, 297 F.3d 1154, 1162 (11th Cir. 2002). Thus, petitioner's argument that this factual finding by the state appellate court is not presumed to be correct under 28 U.S.C. §2254(e)(1) fails.

> The Sixth Circuit, relying on Justice Powell's concurrence in *Kennedy*, has identified factors to guide the court's determination of prosecutorial intent to goad a mistrial. These include a sequence of overreaching prior to the single prejudicial incident, whether the prosecutor resisted or was surprised by the defendant's motion for mistrial, and the trial

> court's findings concerning prosecutorial intent. *White,* 914 F.2d
> at 752 (citing *Kennedy,* 456 U.S. at 680, 102 S.Ct. at 2092 (Powell,
> J., concurring)).

*United States v. Neufeld,* 949 F.Supp. 555, 559 (S.D. Ohio 1996).

Petitioner argues that the facts in this case reflect a sequence of overreaching by the prosecutor, (*e.g.,* witnesses who testified prior to Jessica Davis were unable to identify petitioner as a perpetrator of the offenses charged; the prosecutor's explanation for failing to provide in discovery the taped statement of petitioner and photos viewed by his former girlfriend shortly after the alleged incidents took place was not credible) and therefore suggests an intent to provoke a mistrial. Petitioner also argues that an intent to provoke a mistrial is reflected in both the prosecutor's failure to object until after the trial court had already declared the mistrial and in the prosecutor's apparent awareness of double jeopardy concerns. Finally, petitioner argues that the absence of a sworn statement by the prosecutor denying an intent to provoke a mistrial distinguishes this case from *Oregon v. Kennedy, supra. See Traverse,* at 8-16.

Again, this Court is not persuaded by these arguments. It is not disputed that Jessica Davis, petitioner's former girlfriend, was expected to provide the critical evidence against petitioner. Because she had not yet testified when the trial court declared the mistrial, any lack of evidence at that time establishing petitioner's involvement in the crimes charged does not establish the prosecutor's intent to provoke the mistrial. Further, the negligent failure of the prosecutor or police to timely disclose evidence, standing alone, is simply insufficient to establish the intent required under *Oregon v. Kennedy, supra.*

Contrary to petitioner's argument here, the circumstances presented by this case and the

discovery default of the prosecution are not so unusual as to require this Court to conclude

that the prosecutor must have harbored an intent to goad the defendant into requesting a

mistrial.  In fact, as noted by the state appellate court, the prosecutor explicitly denied his

own awareness of the evidence until shortly prior to bringing it to the trial court's attention.

The state trial court also found that the prosecutor's explanation was credible and that the

prosecutor gained no tactical advantage by the declaration of mistrial:

> COURT: Well, it's a shame that this wasn't properly disclosed
> by the police department to the prosecutor's office.  And I also
> have a question, Miss Prichard.  You said that you would be
> willing not to use the defendant's statement.  Apparently, if I
> understand correctly, there was some significant admissions,
> but also an exculpatory portion of that statement.  But if I
> suppress it, then you don't have it available for rebuttal and
> cross-examination if the defendant were to take the witness
> stand and testify to something that was contrary to what he
> stated in his statement to the police.  And I would doubt that
> anybody from your side would want to do that.
>
> I can – there are other alternatives.  I can grant a continuance,
> so forth.  I can suppress, grant a continuance for discovery
> purposes.  But none of that is going to handle the issue that Mr.
> Thomas talks about, and that is his... strong opening statement
> that the strongest witness the state has is going to be
> discredited because of her coming forward four months after
> the event as a disgruntled former girlfriend.  And I think that's
> kind of a devastating bit of evidence against that opening
> statement, which would raise a great deal of – a significant
> credibility question as far as Mr. Thomas's arguments go.  I
> think it puts him at a huge disadvantage.
>
> ***
>
> A mistrial is granted, based upon – and I will make this finding

because I have heard nothing to suggest otherwise.  I'll make this finding that it appears that there's absolutely nothing for the state to have gained by – what shall I say, provoking is the word I think I'm looking for – provoking a mistrial.  At this point, there's no tactical advantage to be gained.

As a matter of fact, the state is prepared and was prepared to present its witness, Miss Davis, this morning and to find out that there was this other information available at this point could not have been withheld up until now to provoke a mistrial and gain a tactical advantage.

*See Exhibit 4 to Return of Writ,* quoting *Transcript,* July 21, 2003, at 126-129.

[At re-trial]:

COURT: I just now found the disposition sheet from July 23rd. At least it was filed that day.  The actual court date was July 21st.  And I had written on the bottom that this was a mistrial declared at the defendant's request, and the court specifically found that the mistrial was not provoked by the plaintiff, that is, the state or the court.

... I don't see that.  I did not see that in this case.  I don't believe that there was any reason for the state to have provoked the mistrial....

*Id.,* quoting *Transcript,* May 11, 2004, at 10-12.  Moreover, although the prosecutor may well have anticipated a defense attack on the credibility of the key witness against petitioner, there is no reason to believe that the prosecutor could have foreseen an attack based on the date that Davis contacted police; and yet it was this particular issue that ultimately led the trial court to declare a mistrial.

For all of the foregoing reasons, the Magistrate Judge is unable to conclude that the state court's decision rejecting petitioner's Double Jeopardy claim was contrary to or

constituted an unreasonable application of federal law or was an unreasonable determination of the facts in light of the evidence that was presented, *see Williams v. Taylor, supra,* 28 U.S.C. 2254(d), (e), so as to warrant federal habeas corpus relief.  In view of the foregoing, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C.  §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the district Court adopting the *Report and Recommendation.  See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


August 28, 2008                                       _s/Norah McCann King_____
                                                      Norah McCann King
                                                      United States Magistrate Judge